# The Central Pennsylvania Telephone and Supply Co. *versus* Moses Thompson.

1. To render a principal liable, there must be proof of agency, either express or implied; but the fact cannot be proven by the declarations of the alleged agent, nor by his acts done without the knowledge or authority of the principal.

2. Where some evidence of agency has been given, it is competent to give in evidence acts and declarations of the alleged agent, respecting the subject matter of his authority.

3. It is always competent for a principal to show the scope and extent of his agent's authority.

4. The order of evidence to be given is within the discretion of the court. The better practice is, first, to require proof of the agency or of facts from which the agency may fairly be inferred; if this fail, much useless matter may be eliminated.

5. A. contracted with B. to furnish C. telephone poles. B. furnished the poles to C. who at the request of A. made a voucher for the price of the same payable to B. In an action by B. against C. to recover the price of the poles, *Held* to be error to instruct the jury that B. could recover without regard to the question of A.'s agency, B. alleging and C. denying the agency of A.

February 15th, 1886.    Before MERCUR, C. J., GORDON, PAXSON, TRUNKEY, STERRETT, GREEN and CLARK, JJ.

ERROR to the Court of Common Pleas of *Centre county:* Of January Term, 1885, No. 191.

This was an action of debt brought by Moses Thompson against the Central Pennsylvania Telephone and Supply Company to recover the price of a lot of telephone poles furnished by him on a contract made with him by Dunkle, whom he alleged was the agent of the defendant. The plea was *nil debet.*

The following facts appeared on the trial of the case before HOY, P. J.:

The Central Pennsylvania Telephone and Supply Company is a corporation organized under the general corporation laws of the Commonwealth. Its object is to furnish facilities for telephonic communication between different persons in the same community and localities more or less remote from each other. It operates under a license from the American Bell Telephone Company, and uses what is known as the Bell system. Having the right under its charter to transact business anywhere in Pennsylvania, its operations are confined to some

eighteen counties in the central and northeastern parts of the state. Centre county is one of the eighteen. The wires which furnish the medium of communication are ordinarily stretched upon elevated poles planted in the ground along the roadside. The cost of these poles constitute one of the great items of expense in the construction and maintenance of a telephone line.

Late in April, 1883, the company, plaintiff in error, being about to erect several telephone lines in extending their system in Centre county, advertised for bids for poles for the construction of those lines. No bids were received in response to the advertisement, and no contracts were made in pursuance of it. This fact being communicated by the local superintendent of the company to its general manager at its principal office at Williamsport, the latter on or about the 10th day of May, 1883, made a verbal contract with one S. P. Dunkel, who had previously filled similar contracts for the company, to furnish all the poles necessary to complete the lines in Centre county, from Bellefonte to Centre Hall, from Bellefonte to Lemont, and for the two lines or branches from Lemont to the State College and Boalsburg, respectively. By the terms of this contract Dunkel was to furnish good young chestnut poles, reasonably straight and sound, twenty-five feet long, sufficient in number to complete the several lines, seventy-five per cent. of which were to be six inches in diameter, fifteen per cent. five and one half inches in diameter, and ten per cent. five inches in diameter at the smaller end, for which he was to receive for six inch poles one dollar and thirty cents, for five and one half inch poles one dollar and twenty-five cents, and for five inch poles one dollar and fifteen cents each. In pursuance of this contract Dunkel visited Centre county and made contracts with sundry persons for the delivery of poles along the several lines referred to, subject to the inspection of the Telephone Company, and at prices considerably less than he was to receive from the company. In making these subcontracts Dunkel visited Lemont, among other places, and had a conference with William Thompson, the son of Moses Thompson, in reference to furnishing the poles for the lines from Lemont to the State College, and from Lemont to Boalsburg. The result of the conference was that Thompson agreed to consult his father and meet Dunkel in Bellefonte the next day and give him a definite answer. The parties met the next day in Bellefonte, as agreed upon, and came to a substantial agreement, which was embodied in a letter dated May 31st, 1883, written by Dunkel to Moses Thompson & Sons, the full text of which letter is as follows:

BELLEFONTE, May 31st, 1883.

MOSES THOMPSON & SONS—*Dear Sirs,*—Since seeing you have concluded to give you the contract of both Boalsburg and College lines. The men are very much in a hurry, and, for fear of detention, the line will be *stealced* out to Boalsburg to-morrow, and you will please at once commence the job, and as you said you had a nice article of poles, therefore give you the extra price of 5 cents, making it $1.10. Poles to be full 6 inch at top and 25 feet long, nice and straight. Will be up on Tuesday next again, and will call and see you.

Yours respectfully,        S. P. DUNKEL.

Poles will be paid for as soon as contract is filled.

S. P. D.

After the receipt of this letter, he proceeded to supply poles in accordance with his contract. After supplying the major portion of the poles necessary for the completion of both lines, Thompson gave Dunkel notice of his inability to complete the contract, and Dunkel purchased the balance necessary to complete the lines from Musser, who furnished some sixty poles. Of the poles furnished by Thompson under his contract with Dunkel, amounting to two hundred and twenty-one, the inspector of the Telephone Company took up and used one hundred and fifty-four. In July following their delivery Thompson rendered a bill to "S. P. Dunkel, Agent Telephone Company," for two hundred and four poles, amounting, at one dollar and ten cents each, to two hundred and twenty-four dollars and forty cents.

After the completion of his contract for furnishing poles for the several lines in Centre county Dunkel made a settlement with the Telephone Company, at which he was paid the full amount of his contract price for poles furnished, less the amount of certain vouchers made out at his request directly to parties from whom he had purchased poles. Among these vouchers was one to Moses Thompson for one hundred and fifty-four poles, at one dollar and ten cents each, amounting to the sum of one hundred and sixty-nine dollars and forty cents ($169.40). This voucher Dunkel took to Bellefonte, and tendered to Mr. Thompson by telephone, who declined to receive it because it was not for a sufficient amount. He then returned the voucher to the office of the Telephone Company, where it has remained ever since, subject to the disposal of Dunkel.

During the trial the plaintiff made the following offer of evidence :

William Thompson, Jr., on the stand. The plaintiff proposes to prove by this and other witnesses that some time in May, 1883, the witness was asked by W. L. Malin, superinten-

·dent of the defendant company, whether he or the plaintiff could furnish defendant any telephone poles for the line from Bellefonte to the State College. That witness answered he thought they could not. That some little time afterwards, ·one S. P. Dunkel called to see this witness respecting poles for the Telephone Company for its lines from Lemont to the College and to Boalsburg respectively. That witness agreed to see his father, Moses Thompson, the plaintiff, and to meet Dunkel in Bellefonte and let him know what he could do. That after seeing his father he met Dunkel in Bellefonte, and he there agreed for his ·father to furnish poles to and for the defendant company for their lines from Lemont to the State College and to Boalsburg, of a stipulated size, at $1.10 per pole. That said S. P. Dunkel was acting as agent for and on behalf of the defendant company in this transaction.

That next day W. L. Malin, superintendent aforesaid, came to witness and brought a note from said Dunkel asking for poles of a size larger than those agreed upon. That witness told Malin of the different arrangement with Dunkel, but Malin insisted upon the larger poles, and witness told Malin they would do the best they could.

That when the first loads of poles were delivered, to wit, on the 5th day of June, 1883, said loads were inspected by W. L. Malin, superintendent, and R. M. Bailey, general manager of the defendant corporation. That on the 6th day of June, W. L. Malin and said S. P. Dunkel met plaintiff and had a conversation with him, in which plaintiff told them that he could not furnish all the poles of the larger size, and proposed to abandon the delivery of the poles, whereupon said Malin, superintendent as aforesaid, agreed to accept poles of a smaller size and urged the plaintiff to deliver them, and said that Dunkel should go out next day into plaintiff's woods and select them.

That the said plaintiff in pursuance of this arrangement made with said Malin, made and delivered to the defendant company 221 poles. That after the delivery of the poles the defendant company sent one A. C. Crawford, an employee of defendant, to inspect the poles delivered by plaintiff to defendant, that he did so inspect the poles and accepted 154 of them; that plaintiff being dissatisfied with this inspection applied to W. L. Malin, the superintendent of the defendant company, to re-inspect the rejected poles; that said Malin, in company with plaintiff and two of his sons, went along the line to Boalsburg and inspected the poles not already erected and accepted all but 14 poles, thus increasing the number of accepted poles to 207, or, as afterwards agreed upon between plaintiff and Malin, to 204.

[Central Pennsylvania Telephone Co. *v.* Thompson.]

That said 204 poles were taken and erected by the employees of the defendant company or otherwise disposed of by them.

That subsequently the defendant corporation, to wit, on or about the 25th day of July, 1883, made a voucher in favor of plaintiff to cover the number of poles accepted by said Crawford at the contract price agreed upon between plaintiff's agent and S. P. Dunkel, agent for defendant (to wit, $1.10 per pole), but has persistently refused to pay for the additional poles inspected and accepted by W. L. Malin, their superintendent, and has not actually paid for any of the said 204 poles.

Defendants object to the admission of the testimony offered by the plaintiff under his offer, to wit, the declarations of S. P. Dunkel, and conversations had with him, unless his, the said Dunkel's authority to act for and on behalf of the defendant be first shown.

2d. The testimony offered is, at the present stage of this trial, incompetent and irrelevant. Objections overruled, offer admitted, and bill sealed for defendant. (First assignment of error.)

The defendant made the following offer of evidence:

Defendant's counsel propose to ask the witness whether or not W. L. Malin, as the superintendent of the company's lines for the central district, had any authority, in fact, to bind the company by the contracts which he might make, or to modify any contracts made by the company.

Plaintiff's counsel object to the evidence as incompetent to affect the plaintiff in this suit, and we further object to the question that it assumes that Mr. Malin was superintendent for this county only, when he was, in fact, superintendent for the company in general.

BEAVER. While he may have had other counties he is not the general superintendent of the company, because the central district does not embrace all the territory over which this company's lines extend.

To witness:

Q. Is that a fact, that the central district embraces the whole district of your corporation?

A. We have two divisions. We have the North Pennsylvania Division and the Central Division.

Q. The North Pennsylvania Division has not the same superintendent that the Central Division has?

A. No, sir. We have another superintendent up there.

BY THE COURT. Objection sustained, offer overruled, and bill sealed for the defendants. (Second assignment of error.)

The court instructed the jury, *inter alia*, as follows:

The issue which you are sworn to try is an action of debt, originally brought by Moses Thompson against the Central

[Central Pennsylvania Telephone Co. *v.* Thompson.]

Pennsylvania Telephone and Supply Company, before a justice of the peace, from whose judgment it comes into this court by appeal. The plaintiff in this action claims to recover from the defendant the price of two hundred and four telephone poles, which he alleges he sold and delivered to this defendant. The defendant denies its liability, and refuses to pay, and sets up as a defence first, that it never made any contract for poles with Moses Thompson; that it never bought any poles from him and therefore does not owe him anything. They allege they never made any contract with Moses Thompson, but that a contract was made for poles which the company got, by a person independent of and not representing the company, and that the plaintiff must therefore look to him for his pay; and, secondly, that if they were liable they set up the further defence that the poles were not according to contract, and were not delivered within the time, and consequently should not pay the full price therefor. . . . . . .

Now, as to who the parties to a suit are, ought generally to make no difference, whether they are rich or poor, or whether they are individual or artificial persons (in the shape of corporations), but they are to be tried according to their legal rights. A rich man may just as well have a just claim as a poor man, and *vice-versa*, and are equally entitled to the same consideration at the hands of courts and juries. These are facts not to be taken into consideration at all. All cases are to be tried by the law and evidence governing them. It is your duty to find the facts in the case, and apply the law as we lay it down in our general charge. Of course, if we make a mistake in the law, that can be corrected by reviewing the case in the Supreme Court. It is the duty of courts and juries to learn and know as much about a case in the trial of it as is possible, and to know nothing about the parties, but to leave them out of their consideration entirely, and determine the case upon the law and evidence alone. In this same line, we may as well remark that this defendant, The Central Pennsylvania Telephone and Supply Company, is an artificial person, created by the Legislature of the State for a certain purpose. It is a corporation, it is not a natural person; it is the creation of law, but notwithstanding it being an artificial person, yet according to law it is entitled to the same rights as an individual would be, standing in the same relations, or in the same position. You are not to find a verdict against it, or in favor of it, because it is a corporation, nor are you to find a verdict in favor of the plaintiff because he has sued a corporation, but you are to find a verdict either for or against it upon the evidence and facts governed by the law as we shall lay it down to you. Corporations being the creatures of law and not nat-

ural persons, do not act as natural persons do. Taking these parties in this case, Moses Thompson, being a natural person, makes his own contracts, or he may make them through his agents, but he still acts, when acting through agents, for himself. But a corporation can only act through its agents. There is no other way for it to transact any kind of business except through its agents, and its agents may be few or many. [Now, taking this corporation,—we only have the fact that it is a corporation from what is implied by the name of the Central Pennsylvania Telephone and Supply Company, and the admission of the parties during the trial,—the charter of this corporation has not been given in evidence, therefore we have only the name to indicate to us that it is a corporation; nor do we know either what its specific powers are, except what we can gather from the name and the nature of its business. The name itself would indicate what the object and purposes of it are, for which it was incorporated—which would seem to be that it is to supply means for telephonic communication; all know what that is—to erect and operate telephone lines, to erect lines, put up lines, and furnish such facilities and apparatus that are necessary to afford means for communication from one place to another. We all know what that is in practice. We say the name of the company would seem to indicate that these were the purposes and objects for which its charter was granted. Now, the word supply; what does that mean? Why, that the company would furnish all the means required to perfect telephonic communication. We all know what is required to do this, and we know that one of the means required is the putting up of poles to stretch the wires on, or rather it is done by stretching the wire from one point to another, and the means of support for the wires are poles, which are put up for this purpose, and are then known as telephone poles.] (Fifth assignment of error.)

[Now, this company having been established for this purpose, they have all the rights, or at least are presumed to have all the rights and powers, the charter not being in evidence, the company is supposed to have all these rights and powers to establish methods and means for this kind of communication; that is, to put up these wires and poles, appliances, and machinery for having telephonic communication. Somebody must act for this company, therefore any person who is connected with this company, or is put out or held forth to the public as having a connection with this company is presumed to be an agent of the company for doing such things as are within the line of his duty, and the legitimate scope of the position he is held out to occupy.] (Sixth assignment of error.)

[It is shown in this case that Mr. Malin is the general superintendent of the Central Pennsylvania Telephone and Supply Company.· It appears from the evidence.. here that he had charge of the erection of these lines for which these poles were furnished; that he was here superintending the erection of these lines as the general superintendent. Now, we say to you, gentlemen of the jury, as a matter of law, whatever Mr. Malin did as superintendent necessary and proper for the erection and construction of these telephone lines, in the absence of notice to the public that his powers were restricted, in the absence of any notice to the public that he had not the power which his position would lead the public to believe he had, that the very position in which he was held out to the public gave him power and authority to contract for poles for the erection of those lines. That is a question of law, and we say to you that from his position he had such authority. It will not do for this company to hold out persons, and authorize them to advertise themselves as superintendents, and let them go on and do whatever is necessary to accomplish the end in view, and then, whenever a contest is set up, to deny that the person advertising for poles and signing himself as superintendent did not have power or authority to contract for poles. They cannot do that. The very position which he occupies in relation to this company implies the power to do that, and it is alleged and claimed by the plaintiff here that he had power to contract for these poles from the very position he holds, and that the company are bound by his acts, which were strictly and properly within the scope of his duties.] (Seventh assignment of error.)

If Mr. Malin or any other agent of the company undertook to make a contract for the company, and did so outside of what is the legitimate scope of his authority, arising from his agency or position, it would not be binding upon the company. [If Mr. Malin or Mr. Dunkel assumed as agents for this company, and we do not say they were in fact duly authorized agents, but if they made a contract for the company for the delivery of poles, and they were delivered in pursuance of such contract, and received and used by the company, then the company is liable for the poles.] (Eighth assignment of error.)

But if Mr. Malin or Mr. Dunkel had made a contract for telephone or telegraph poles to be delivered not to the Central Pennsylvania Telephone and Supply Company, but to the Western Union Telegraph Company for instance, without special authority, that would not have been within the legitimate scope of their positions and authority. No person that would be dealing with them upon a contract of that kind could

recover from the company without first showing they had power from the company to make such contract.

If Moses Thompson or anybody else would contract with either Mr. Malin or Mr. Dunkel for poles for the Western Union Telegraph Company, and in pursuance of that contract he would deliver the poles, he could not recover if Mr. Malin or Mr. Dunkel were not authorized agents of the company to make contracts of that character. It would have been his duty in the first place to inquire of the company himself if Mr. Malin or Mr. Dunkel had such power, and if it was not within their authority then, of course, the company would not be bound by it. But when Mr. Malin undertakes to make a contract for the benefit of this company, and the company receives a benefit from it, then the company would be liable. Applying these principles to the facts in this case and the evidence is for you, not for the court. It is not the desire of the court to express what the facts were, because that is legitimately your province; you must determine whether or not certain facts are proved, and draw your own conclusions from those facts. We do not propose to review all the evidence in the case, but will simply call your attention to some of its main features as they occur to us now.

[It is claimed by the plaintiff that he made this contract with S. P. Dunkel; that S. P. Dunkel represented himself as acting for the company, buying poles for the company, and that they were to be delivered to this company and not to Mr. Dunkel. The plaintiff further alleges that upon the representations and acts of Mr. Dunkel he believed him to be the agent of the company at the time he delivered the poles, and delivered them upon the credit of the company and not of Mr. Dunkel, who was an entire stranger to him at the time. Whether the evidence establishes this fact is a question for you, gentlemen of the jury. That is a question for you to determine, and not for the court. If the testimony of the plaintiff is believed there is sufficient evidence to establish that fact; but if the testimony of the defendant as it now stands is to be believed, it negatives such conclusion.] (Ninth assignment of error.)

It is the duty of the jury to reconcile all conflicting testimony in the case if you can. Nearly all the evidence is verbal testimony. [There is, however, a letter given in evidence which we have not read, but which is an important item of testimony in the case. As we recollect it, this letter was written by S. P. Dunkel, and signed by him as S. P. Dunkel. We did not read the letter, but it was read in our hearing in the trial of the case for the benefit of the jury and court. The contents of the letter made an impression upon us, in harmony

with the idea that he was acting not for himself, but for the company. He did not use the pronoun or word " I," but " will give," etc., which, of itself, would be calculated to leave the impression upon the mind that there was some one else beside himself engaged in the transaction, and from which it might be inferred that he was the acting agent of the company and not himself; or at least the letter, in the way it is worded, does not antagonize or deny the agency, notwithstanding he did sign only his individual name. In the letter he does not say that " I will give you," but " will give," hence the person receiving the letter might supply either the company or the personal pronoun " I." He don't say which, but he leaves it in a very indefinite way. Whether he intended to express it vaguely, or whether or not it was intended to convey a double meaning, that is, the position it is in now, you must determine from all the evidence what was intended.] (Tenth assignment of error.)

[Now, gentlemen of the jury, take into consideration this letter and the other oral testimony, also the testimony of Mr. Bailey, who claims to be the general manager of the company, and that he alone has power to make such contracts, and that Mr. Malin had not. What was said by Mr. Bailey and Mr. Malin in the interview with Mr. Ralston? what was said there in the road, and what word was sent to Moses through Mr. Ralston? You will also take into consideration the connection that Mr. Malin had with the contract when the Thompsons contracted to deliver the poles, and what he said when he inspected them after they had been delivered. Mr. Malin says that the poles did not come up to the requirements of the contract, yet it is claimed by the plaintiff that these poles were inspected by Mr. Malin, and marked and accepted by him for the company. Mr. Malin admits that he examined the poles and marked them, but he denies that they were accepted by him; that he had no power to accept them; that he would have transcended his authority had he done so. Well, as a question of law, the position that Mr. Malin occupies in this company, if he did make an inspection of these poles, and marked and accepted them for the company, then, as a question of law, we say to you that his position in the company as general superintendent would give him power to contract for, inspect, and accept the poles, and the company would be bound by his acts.] (Eleventh assignment of error.)

Whether he did contract for and inspect, mark, and accept them is a question for you. The conflicting testimony you must reconcile if you can, and come to the conclusion as to what the testimony proves. Did Mr. Malin make that examination, mark and accept these poles, as the plaintiff claims?

If he did, then the company would be bound by his acts, and would have to pay for the poles.   [If you believe that they— Mr. Malin·and Mr. Dunkel—were· not acting as the agents of this company, the company in any event would be liable for the poles they used.   They admit that they used 154 of them, and they are now in use, as appears from the testimony.   But the 50 additional poles claimed by the plaintiff, it seems the company did not use, and it appears they are now lying along the route of this telephone line, on the ground.   It seems they were delivered on the ground, but were not used by the company.   You will take into consideration also what occurred in reference to the contract with Mr. Musser, after Mr. Malin had made an inspection of these poles and had marked them.   It is claimed here by the plaintiff that Mr. Malin directed word to be sent to Mr. Musser not to deliver poles where the Thompson poles already delivered were marked " O K," or, in other words, to deliver only where the poles already delivered on the ground were marked with a cross ($\times$).   Whether Mr. Malin inspected, marked, and accepted these poles, or not, is a question you will have to determine.   You will take up all this testimony, their advantage in this case if they had made a legal tender, as the plaintiff would then not be entitled to recover costs unless he received a greater sum than was tendered, and it thus would have protected the defendants against the recovery of the costs.   Of course, if a tender had been made to Mr. Thompson he would not be precluded from recovering because his money was tendered to him, but the recovery would be without costs ; not having made a legal tender to him, and the company having the money, he is entitled to recover that much in any event, and your verdict will be for $169$\frac{40}{100}$, with interest from the time it was due and payable.]   (Twelfth assignment of error.)

[But if you find that the contract was made as .claimed by the plaintiff with Mr. Dunkel, representing himself as the agent of the company, and Mr. Malin so acted as to lead the plaintiff to believe Dunkel was the agent of the company, and you find that poles were delivered under such contract and accepted to the number· of 204, then your verdict should be for the full amount of plaintiff's claim.   As you find these facts so your verdict will be.]   (Thirteenth assignment of error.)

[It is claimed that there can be no recovery because the poles were not delivered according to the contract as to time. This is also a question for the jury, whether the contract was fulfilled as to the time in which these poles were to be delivered.   There was no time fixed in which these poles were to be delivered, at least we do not remember any such evidence.

If there is any such evidence the jury will remember it, and will take it into consideration. There was no time limited in which these poles were to be delivered as we recollect the testimony; but the evidence is that they were to be inspected, and they were inspected and accepted after the inspection, or within a few days after they were delivered. It is not a written contract, and we cannot give the jury binding instructions as to whether the contract was fulfilled or not fulfilled. If the contract was not fulfilled according to the terms of it, it is claimed by the defendant, and we are requested to so instruct the jury, that the plaintiff could not recover in this case, even though the jury believe that there was a contract between the plaintiff and defendant. We decline to say so to you, gentlemen of the jury, but say that in any event the plaintiff would be entitled to recover $169\frac{40}{100}$, because the defendants themselves have shown that they have retained from Mr. Dunkel $169\frac{40}{100}$, and they admit it to be Moses Thompson's money, and in any event he would be entitled to recover that much, and if you find that the 50 additional poles were inspected and accepted by Mr. Malin for the company, then he would be entitled to recover the full amount claimed.] (Fourteenth assignment of error.)

Verdict for the plaintiff in the sum of $243.58 and thereupon judgment; whereupon the defendant took this writ assigning for error, *inter alia*, the admission of the plaintiff's testimony contained in his offer, the rejection of the defendant's testimony as contained in its offer, and those portions of the charge included within brackets.

*Beaver* (*Gephart* with him), for plaintiff in error.—It is an elementary principle of the law of agency that the fact of agency cannot be established by the acts and declarations of the alleged agent.

This principle was laid down very early in Pennsylvania, and has been consistently held until the present day, as the cases from Plumsted v. Rudebagh, 1 Yeates, 502, to Grim v. Bonnell, 78 P. S. R., 152, abundantly show. Agency cannot be proved by the declarations of the agent without oath, and in the absence of the party to be affected by them: Clark v. Baker, 2 Wharton, 340; Chambers v. Davis, 3 Id., 44.

An agent is competent to prove his own authority when it is by parol, but his declarations *in pais* are not proof of it; and though they become evidence as part of the *res gestæ*, if made in the conduct of the business intrusted to him, yet other evidence must first establish authority to speak before his words will bind his principal: Jordan v. Stewart, 11 Harris, 244. Upon the principle that the authority to speak must be first

2 AMERMAN—9

established, we objected to the admission of the offer of the plaintiff below, as contained in our first specification of error, and the utter failure of the testimony to come up to the offer shows the wisdom of the rule: See also Moore's Exrs. *v.* Patterson, 28 P. S. R., 505.

The doctrine of ratification applies only where the relation of principal and agent exists: P. & T. Railroad Co. *v.* Gazzam, 32 P. S. R., 340. It is error to submit to the jury the question of whether the party subsequently ratified the act of a person acting without authority, where there is no evidence that the facts were ever communicated to the party, or that he assented to the acts alleged to be done for him: Moore's Exrs. *v.* Patterson, 28 P. S. R., 505, *supra.*

In the trial of a cause depending upon the facts in evidence, if the court in their charge to the jury review only those which have a tendency to establish one side of the case, it is calculated to mislead the jury, and is error for which the judgment will be reversed: Parker *v.* Donaldson, 6 W. & S., 132.

"It is error to confine the attention of the jury to one view of the case when there is more than one which they should consider": Pennsylvania Coal Company *v.* Harris, 12 W. N. C., 432.

There is no evidence anywhere in the case that Malin was general superintendent of the company. William Thompson, Jr., plaintiff's witness, says he (Malin) was superintendent of the company. Malin when on the witness stand says: "I am superintendent of the Telephone Company, the Central Division," and yet the court repeatedly and persistently speaks of him as the general superintendent of the company, evidently for the purpose of giving his position the greater dignity and the higher authority. This point was ruled in the case of The American Life Insurance and Trust Company *v.* Shultz, 82 P. S. R., 46. In delivering the opinion of the court, Mr. Justice PAXSON says: "But it was manifest error to exclude an inquiry as to the powers of Mr. Geiger, the agent, with whom the plaintiff contracted. His acts could only bind the company within the scope of his authority, hence proof of his authority was material even for the plaintiff."

*D. S. Keller* (*John H. Orvis* with him), for defendant in error.

1. When there is any evidence which alone would justify an inference of the disputed fact, it must go to the jury, no matter how strong or persuasive may be the countervailing proof: Howard Express Co. *v.* Wile, 14 P F. S., 201; First Nat. Bank *v.* Wirebach's Exr., 10 Out., 47.

Assuming that the jury would be justified in inferring from

the facts that Dunkel was the agent of the company, the statements and declarations made by him in the conduct of said agency should also go to the jury.

The doctrines laid down in Moore's Exrs. v. Patterson, 28 Pa. St. R., 505, and Pittsburg & Steubenville R. R. Co. v. Gazzam, 32 Pa. St. R., 340, have no application to the facts in this case. In those cases no contract relation whatever was shown to exist between the alleged principals and agents. Here the company alleges that Dunkel was a contractor with them for the furnishing of poles. A contractor is but one of the various kinds of agents, and the recognition of the fact by the company that they were likely to be bound by his purchases made in their behalf is found in the fact that they uniformly deducted from the price of the poles furnished by him the sums due to the parties from whom the poles were bought.

2. An adoption of the agency in part adopts it in the whole, because a principal is not permitted to accept or confirm so much of a contract made by one purporting to be his agent as he shall think beneficial to himself and reject the remainder: 1 Parsons on Contract, p. 52, and see note (l).

Mr. Justice CLARK delivered the opinion of the court, March 1st, 1886.

The plaintiff, Moses Thompson, claims to recover, in this suit, the price of two hundred and four telephone poles, which he alleges he sold and delivered to the Central Pennsylvania Telephone and Supply Company in the months of May and June, 1883, under a contract with one S. P. Dunkel, the company's agent. It is not denied that the company received the poles, or a part of them, and that they applied them to their use in the erection of the Boalsburg and College lines; but, by way of defence, the company allege that they purchased the poles, not from Thompson, but directly from Dunkel, and that no contract relation whatever, at any time, existed between Thompson and the company with reference thereto. They allege that Dunkel had an independent contract with the company, by the terms of which he was to supply the poles at a certain designated price, and that the poles were received by the company from Dunkel upon the footing of that contract, and not otherwise.

The agency of Dunkel was, therefore, without doubt, the pivotal point in the case. It was not important what Moses Thompson may have supposed, or, indeed, what the conduct of Dunkel may have induced him to believe as to his authority, if the company received the poles in good faith upon the footing of a contract they had with Dunkel himself. To render a principal liable there must be proof of agency, either

expressed or implied; but the fact cannot be proven by the declarations of the alleged agent, nor by his acts, done without the knowledge or authority of the principal: Whiting *v.* Lake, 91 Pa. St., 349. The offer contained in the first specification, however, was without doubt rightly received, for it contained a proposition to show, directly, that Dunkel was acting as the agent of the company in this transaction, with other matters in corroboration, and that the poles, to the number of two hundred and four, were actually appropriated and used by the company. The offer was not as specific as it should have been; it did not disclose the nature of the evidence by which the fact would be shown; but it was not objected to on that ground. The order of the evidence to be given under the offer was within the discretion of the court. The better practice undoubtedly is, first, to require proof of the agency, or of facts from which agency may be fairly inferred, and if this fail much useless matter may be eliminated from the cause.

The evidence of William Thompson, it is true, fell far short of the offer. It related almost exclusively to the acts and declarations of Dunkel and of Malin, the superintendent, the admissibility of which wholly depended upon their authority to represent the company in a transaction of that kind, and no evidence of that authority had as yet been given.

At that stage of the trial the court, on the defendant's request, would doubtless have withdrawn his testimony from the consideration of the jury. Other evidence, to which we will not refer, was afterwards received, however, bearing upon the question of Dunkel's agency, and the rule is well settled, where some evidence of agency has been given, it is competent to give in evidence the acts and declarations of the alleged agent respecting the subject matter of his authority: Stewartson *v.* Watts, 8 Watts, 392.

The acts and declarations of Mr. W. L. Malin were also relied upon to fix the responsibility of the company. Mr. Malin is the superintendent of the company's lines, and it is alleged that what he said and what he did in relation to the delivery of these poles had a tendency to cause Thompson to believe that Dunkel represented the company in his contract. The learned court, in substance, instructed the jury that if from the acts and declarations of Dunkel, "and the action and part taken by Malin," Thompson was led to believe that he was contracting with the company, the defendants, having received the poles, were bound to Thompson for the price. We fail to find, after a careful examination of the testimony, that Malin did anything, or said anything, which would justify the submission of the inquiry suggested. But if he did, it was but fair that the

defendants should have been allowed to show, by R. M. Bailey, the general manager, whether or not Malin, as the superintendent of the company's lines for the central district, had any authority, in fact, to bind the company by what he said or did in reference to their contracts. It was clear error to exclude this inquiry. It is always competent for a principal to show the scope and extent of his agent's authority. A superintendent is defined to be one who has the oversight and charge of something, with the power of direction, as the superintendent of an alms house or of the public works; but a superintendent may have no authority to furnish supplies or purchase materials for the enterprise he directs. What possible objection could there be to showing precisely what his powers were? If he was held out to the world in his general course of business for more extensive powers, the effect of the whole evidence was for the jury. His acts could only bind the company within the scope of his authority, hence proof of his authority was an important and material question. In American Life Ins. Co. v. Shultz, 1 Norris, 51, the plaintiff had given some evidence to show that one Geiger was agent for the company, but without any definite or accurate statement of the scope of his authority, and it was held competent for the company to show what his powers were, and that he exceeded them, or to even deny the agency itself. "The extent of an agent's powers," says the court in that case, "depends upon the authority under which he acts. This may be shown by his written instructions or his course of dealing. It is true the public are not always bound by the private instructions of the agent, and may hold the principal responsible, though the particular acts done are in excess of his private instructions. This was asserted in Adams Express Co. v. Schlessinger, 25 P. F. S., 246. It applies to cases where the agent has been held out to the world as such by the principal, allowed to exercise enlarged powers from time to time, and his acts therein have been ratified by his principal. But this doctrine in no sense conflicts with the right of the principal to show that his agent in a given case exceeded his authority. The effect of such evidence, when received, is for the jury." It was error, therefore, arbitrarily to determine the scope of Malin's authority from the mere fact that he was the "superintendent," and after admitting proof of the manner in which, in specific instances, he was held out to the world, to exclude the evidence of his particular instructions from the company.

We are of opinion also that too much was made of the corporate name of the company. The object and design of a private corporation are not to be ascertained in its corporate title;

but if they were, and it was assumed that the especial business of this company was the purchase and sale of supplies for telephone communication, no implication could arise, that therefore the purchase of these poles by Dunkel was directly in behalf of the company. What was said on this subject was not perhaps, in itself, absolute error, but its tendency, we think, was to mislead the jury.

Nor do we think the learned court was justified in the comments made upon the letter of May 31st, 1883, from Dunkel to Thompson. The letter referred to is written in a style quite common in business communication. There is no room for the suggestion that it was "intended to convey a double meaning," or that the writer purposed "to express his meaning vaguely," nor can it be construed to leave any impression upon the mind "that there was some one else beside himself engaged in the transaction," or raise an impression "that he was acting for the company." It may be said, with propriety perhaps, that the letter does not antagonize or deny Dunkel's agency, but it certainly contains nothing which is inconsistent with the claim of the defendants, that his purchase was on his own account. The exposition which the learned court gave of this paper was one-sided, conjectural and argumentative. The letter, *prima facie*, imports a purchase by Dunkel himself, but if it appear by proper evidence, *aliunde*, that it was in fact written by Dunkel, acting as the agent of the company, it cannot be said to be inconsistent with that view of the case.

The most serious error, however, into which the learned court fell was in giving to the jury binding instructions that, without regard to the question of Dunkel's agency, the company were, in any event, bound for the price of 154 poles, which it is admitted passed the inspection, and were applied to the use of the company. After the completion of this contract for furnishing poles for the several lines in Centre county, Dunkel made a settlement with the Telephone Company, at which he was paid the full amount of his contract price for poles furnished, less the amount of certain vouchers made out at his request directly to parties from whom he had purchased poles. Among these vouchers was one to Moses Thompson for one hundred and fifty-four poles, at one dollar and ten cents each, amounting to the sum of one hundred and sixty-nine dollars and forty cents ($169.40). This voucher Dunkel took to Bellefonte, and tendered to Mr. Thompson by telephone, who declined to receive it because it was not for a sufficient amount. He then returned the voucher to the office of the Telephone Company, where it has since remained.

Referring to the amount of this voucher, the learned court says: "The plaintiff would be entitled to recover that amount

in any event—the price for 154 poles, which the company admits it received, and which it has now in use, and for which it has drawn a voucher for $169.40 in favor of Moses Thompson, the plaintiff. The plaintiff is entitled to recover that amount, even though the jury should believe that there was no contract for the delivery of those poles between the plaintiff and this company, but that the contract was between Moses Thompson and S. P. Dunkel; for the company has settled with Mr. Dunkel, and retained $169.40 for Mr. Thompson, and they cannot now retain this $169.40, which they admit belongs to Moses Thompson. We therefore say to you that it is liable to Moses Thompson for that amount, for money had and received for his use. The plaintiff claims this, and as a principle of law we are bound to say to you that the point is well taken. According to their own showing, this money belongs to Moses Thompson."

Assuming that the company originally stood in no contract relation to Thompson, but received these poles under their agreement with Dunkel, and this in view of the charge, must be assumed, the instruction of the court, quoted above, is manifestly erroneous. The company, by making a voucher in Thompson's name, assumed no responsibility to him until that voucher was accepted. It was delivered to Dunkel, who tendered it to Thompson, in discharge of his own debt; the tender having been refused, no liability of the company was thus created. It is unimportant that the voucher was returned, and that the money is still on deposit with the company. Thompson, having declined to accept it, Dunkel might dispose of it as he chose.

It is further contended on part of the company that the poles were to be paid for only when the contract was "filled, and that the contract had not been completed, or fully performed by the plaintiff at the time this suit was brought." This assignment of error cannot be sustained.

There is some evidence that Thompson, after the receipt of the letter of May 31st, 1883, objected to the size of the poles required. He said he could not furnish poles of that size, but being urged to go on, said he would do the best he could. It is shown that he furnished 154 poles of the required size, which were accepted, and there is some proof that 50 others of a less size, although at first rejected, were afterwards also accepted. If this be so, the contract would appear to have been *bonâ fide*, substantially performed. Besides, if this were not so, the parties would appear to have mutually dispensed with full performance.

We are of opinion, however, that, leaving out of view the order in which it was received, the evidence, as a whole, was

such as required a submission to the jury of the question of the agency of S. P. Dunkel. We do not desire to refer to, much less to discuss, the various matters exhibited in the proofs in chief and rebuttal, upon which this opinion is expressed, as, in so doing, we might, without intending it, damage the interests of one or other of the parties at the next trial.

For the reasons above expressed, the judgment is reversed, and a *venire facias de novo* awarded.